UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PATRICIA G. LANE,                         )
                                          )
                    Plaintiff,            )
                                          )
            vs.                           )
                                          )        No. 1:12-cv-01180-SEB-TAB
WALGREEN CO.,                             )
                                          )
                    Defendant.            )

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTIONS TO STRIKE

This cause is before the Court on three motions filed by Defendant Walgreen Company:

(1) a motion for partial summary judgment on Count II of Plaintiff's complaint [Docket No. 36],

filed on January 15, 2014; (2) a motion to strike Plaintiff's expert disclosures and exclude

Plaintiff's expert witnesses [Docket No. 47], filed on February 18, 2014; and (3) a motion to

strike Plaintiff's second supplemental expert disclosures [Docket No. 57], filed on March 14,

2014. For the reasons set forth below, the two motions to strike are DENIED and the motion for

partial summary judgment is GRANTED.

## Factual and Procedural Background

### Facts

Plaintiff's decedent Oral A. Lane was a resident of Logansport, Indiana. Compl. ¶ 1. At

the time of the events giving rise to this suit, Mr. Lane was in his mid-70s, and suffered from a

number of chronic health problems, including hypertension, congestive heart failure, atrial

fibrillation, type 2 diabetes, and chronic kidney disease. Def.'s Ex. 5 at 2. He also had a history

of colon cancer, and as of 2010, he was undergoing chemotherapy, with treatments scheduled

every two months, to treat the myeloma (cancer of the bone marrow) afflicting his clavicle and ribs. *Id.* When Dr. Raymond M. Harwood, Lane's longtime treating oncologist, diagnosed Lane with myeloma in early 2009, he estimated that Lane could be expected to survive three to four years if he opted to undergo chemotherapy. Harwood Dep. 38–40. When Lane saw Dr. Harwood for a bi-monthly appointment on September 28, 2010, Harwood judged that Lane was handling his chemotherapy well, and noted that Lane was alert and capable of handling most aspects of daily life with some assistance. *Id.* at 86–88; *see also* Bennett Dep. 23; Patricia Lane Aff. ¶¶ 2–4. Nonetheless, his primary care physician, Dr. Cherie Bennett, described his overall condition in 2010 as "frail and elderly." Bennett Dep. 32.

On October 14, 2010, Lane visited Dr. Bennett's office complaining of neck pain. Bennett Dep. 30. Dr. Bennett prescribed Lane a liquid preparation of the drug Oxycodone, with instructions to take a 5 mg/5mL dose orally every six hours. Compl. ¶ 8. Later that day, Lane's wife, Plaintiff Patricia Lane, filled the prescription at a retail pharmacy owned by Defendant Walgreen Company, located at 2301 East Market Street, Logansport, Indiana. *Id.* at ¶ 7. The pharmacy allegedly filled the prescription incorrectly, giving Mrs. Lane a preparation containing a much higher concentration of the drug, at 20 mg/mL. *Id.* at ¶ 9. Less than an hour after he took his initial dose of the Oxycodone, Mr. Lane suffered a fall in his home; his wife found him lying on the floor, disoriented and speaking incoherently. Def.'s Ex. 5 at 2. Mrs. Lane took her husband to the hospital, where he underwent tests including a CT scan as a precaution against brain damage. Dr. Christopher Marino, who authorized Lane's discharge from the hospital two days later on October 16, 2010, noted that Mr. Lane was "awake, alert and oriented x2,[1] not in acute distress." *Id.* at 3. In his deposition testimony, however, he acknowledged that Mr. Lane

---

[1] Physicians normally describe a patient as "oriented x3" when he or she is alert to "time, place, and person." Dr. Marino's notation thus indicates that Mr. Lane had less than full orientation at the time of his release.

was still "confused" at the time of his release from the hospital. Marino Dep. 126. At the time he discharged him from the hospital, Dr. Marino was not aware that Mr. Lane had been given an overdose of Oxycodone. Marino Dep. 87–88.

Two days later, on October 18, 2010, Mr. Lane was admitted to Logansport Memorial Hospital for a more extended period. At this point, he was having difficulty walking and caring for himself, and he complained of further neck pain and confusion; Dr. Bennett describes him as being "bedbound" during his stay in the hospital. Bennett Dep. 59, 61. A chart note from October 30, 2010, states that Mr. Lane "requires maximum of assistance with transfers via Hoyer lift and maximum assistance for turning and repositioning." *Id.* at 60. After a week's inpatient stay at the hospital, Mr. Lane was transferred to The Arbor, a transitional "skilled nursing" facility at which he received physical therapy. *Id.* at 53–54. He briefly returned to his home in November 2010, but shortly thereafter suffered a fall in which he broke his femur. *Id.* at 54. When Mr. Lane saw Dr. Harwood for his next bi-monthly appointment regarding his myeloma treatment, Harwood determined that Mr. Lane was too frail to tolerate chemotherapy; Harwood noted at the time that he wanted to discontinue chemotherapy at least long enough to "let the dust settle," and he recounted later that, at that point, he felt "the risks of treatment . . . outweighed the benefits." Harwood Dep. 90.

Mr. Lane's health continued to deteriorate. When Dr. Harwood saw him next on February 15, 2011, he determined that Mr. Lane's condition remained too poor to tolerate chemotherapy, and he referred him to hospice care. Harwood Dep. 104; Bennett Dep. 42. Mr. Lane resided at the Hope Hospice in Cass County, Indiana until his death on April 21, 2011. Compl. ¶ 5. His death certificate was signed by his personal care physician Cherie Bennett, who was also the health officer for Cass County. Def.'s Br. 2–3. Dr. Bennett stated at the time, and reaffirmed in

later testimony, that Mr. Lane's death was "multifactorial"—brought on by multiple causes. Bennett Dep. 74. On the death certificate, Dr. Bennett listed three "causes of death": multiple myeloma, congestive heart failure, and hypertension. Def.'s Ex. 4 (Death Certificate). She also listed a number of other factors as "significant conditions contributing to death": colon cancer, rectal cancer, chronic renal insufficiency, vitamin B12 deficiency, hyperlipidemia, and paroxysmal atrial fibrillation. *Id.* The death certificate contains no mention of Mr. Lane's alleged Oxycodone overdose in October 2010.

### Procedural History

Plaintiff Patricia Lane is the personal representative of the estate of Oral Lane. On July 18, 2012, she brought suit in the Marion County Superior Court. Docket No. 1. The complaint contained two counts: Count I as a survival action under Ind. Code § 34-9-3-1, and Count II as a wrongful death action under Ind. Code § 34-23-1-1. On August 20, 2012, Defendant removed the case to this Court on the basis of diversity of citizenship. Docket No. 1.

In September 2013, Magistrate Judge Baker approved a Case Management Plan that set the Rule 26 deadline for Plaintiff's disclosure of information regarding expert witnesses as January 15, 2014; Defendant's deadline was February 15, 2014. Docket No. 47, Ex. A. at 3. Plaintiff submitted her expert disclosures on the deadline date. The first expert listed—and the only one identified by name—was Dr. Cherie Bennett; Plaintiff provided the doctor's address and referred to the *curriculum vitae* attached to her deposition, which had been taken on October 23, 2013. *See* Docket No. 35. Second, Plaintiff listed "[a]ll of the Plaintiff's treating medical care providers," explaining that they had not been retained as expert witnesses but "may provide expert testimony regarding their care and treatment of Oral Lane." *Id.* After Defendant's counsel wrote to Plaintiff's counsel expressing his belief that the initial expert disclosures were

inadequate, the parties agreed to allow Plaintiff until January 27, 2014 to make a supplemental

disclosure, extending Defendants' disclosure deadline by an equivalent number of days. *See*

Docket No. 37, Ex. C; Docket No. 47 at 2. Plaintiff filed her supplemental disclosure on the

deadline date; in it, she provided a paragraph-length summary of her intended use of Dr.

Bennett's testimony:

> Dr. Bennett testified that Defendant's employee filled Mr. Lane's prescription with
> the incorrect dosage and then failed to recognize the error before the product was
> sold to the patient. As a result of the wrong dosage given to Plaintiff, he
> subsequently suffered, including but not limited to, a fall, hospitalization,
> disorientation, wider/over-medicated, and further injuries consistent with her
> deposition. In her deposition on October 22, 2013, she testified that the mis-filled
> prescription overdose caused serious injuries to Mr. Lane requiring
> hospitalization.

Docket No. 47, Ex. F. Plaintiff also provided the names of four other care providers—Kathleen

Kunkel, Angelique Witlam, Donna Hermance, and C. Miller—but noted that these were

anticipated as potential fact witnesses rather than experts. *Id.* On February 18, 2014, Defendant

filed a "motion to strike Plaintiff's expert disclosures and to exclude Plaintiff's expert

witnesses," contending that, even after it had been supplemented, Plaintiff's disclosure was

deficient under Rule 26. *See* Docket No. 47.

In late February 2014, Defendant took the depositions of two physicians as potential fact

witnesses in the case. The first was Dr. Christopher Marino, who supervised Mr. Lane's

discharge from the Logansport Memorial Hospital on October 16, 2010; the second was Dr.

Raymond Harwood, his treating oncologist. Docket No. 51 at 1–2. On cross-examination, both

men gave testimony that Plaintiff felt might be valuable opinion testimony at trial. Docket No.

86 at 2–3. In an effort to secure her ability to present the two physicians' opinions, Plaintiff filed

a "second supplemental" expert disclosure on March 4, 2014. Docket No. 51. In this document,

she listed Bennett, Marino, and Harwood as potential expert witnesses. Plaintiff did not provide

addresses or summaries of their planned testimony for either Marino or Harwood; instead, she submitted the following statement beneath each doctor's name: "Plaintiff had no plans to take his deposition. However, due to the testimony elicited by Defendant, Plaintiff intends to use his deposition at trial. His testimony and opinions elicited by Defendant are in his deposition. His deposition will be used at trial as Plaintiff does not intend to call him live." *Id.* at 1–2. On March 14, 2014, Defendant filed a second motion to strike these additional expert witness disclosures, contending that Plaintiff's disclosure of Marino and Harwood as witnesses was untimely and failed to meet the specificity requirements of Rule 26. *See* Docket No. 57.

<u>Legal Analysis</u>

Of the three motions before us, we address Defendant's two motions to strike first because their resolution heavily affects the viability of the wrongful death claim that is the subject of Defendant's motion for partial summary judgment.

**I.      Motions to Strike**

**A. Legal Standard**

Federal Rule of Civil Procedure 12(f) provides that a court may, *sua sponte* or on the motion of a party, strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). As the rule's language indicates, a motion to strike should be granted only in rare circumstances, and such motions are "disfavored" because they "potentially serve only to delay." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *Crowder v. Foster Wheeler, LLC*, 265 F.R.D. 368, 370 (S.D. Ind. 2009). For this reason, a motion will be successful where it "remove[s] unnecessary clutter from the case," expediting the resolution of the case rather than erecting another obstacle

to its consideration on the merits. *Id.* (citing *United States v. 416.81 Acres of Land,* 514 F.2d 627, 631 (7th Cir. 1975).

Here, Defendant invokes the expert disclosure requirements set forth by Federal Rule of Civil Procedure 26 and the sanctions for disclosure violations authorized by Federal Rule of Civil Procedure 37. Rule 26 provides that, for experts who are not required to submit a written report, the disclosing party must state "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705," and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. Pro. 26(a)(2)(C). The rule additionally requires parties to supplement their disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. Pro. 26(e)(1)(A).

If a party fails to provide the required expert witness information, or does so in an untimely manner, Rule 37 states that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. Pro. 37(c)(1); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). Although the language of the rule appears clear-cut, courts possess considerable discretion in determining whether a violation warrants the exclusion of evidence or witnesses. *See Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 515 (7th Cir. 2011); *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003). The Seventh Circuit directs that we consider four factors in exercising this discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not

disclosing the evidence at an earlier date." *Tribble v. Evangelides,* 670 F.3d 753, 760 (7th Cir. 2012) (citing *David*, 324 F.3d at 857).

## B. First Motion to Strike

Defendant's first motion to strike, filed in response to Plaintiff's first supplemental expert disclosure, challenges Plaintiff's disclosure of Dr. Cherie Bennett as an expert and other medical care providers as possible fact witnesses. *See* Docket No. 47. In response to Defendant's motion, Plaintiff signaled that it was withdrawing Kathleen Kunkel, Angelique Witlam, Donna Hernance, and C. Miller, leaving Dr. Bennett as the only witness designated. Docket No. 66 at 1 n.1. Plaintiff also made clear that she intended to rely only on Dr. Bennett's deposition testimony, which was taken in October 2013 and of which both parties are fully apprised. Docket No. 84 at ¶ 3. Defendant now agrees with Plaintiff that "by limiting her examination of Dr. Bennett to her deposition testimony, [Plaintiff] has fully disclosed Dr. Bennett's proposed opinions." *Id.* at ¶ 4. Defendant concedes that, based on this clarification, "there remain no other issues in the pending Motion for the Court to address." *Id.* at ¶ 5. Defendant's first motion to strike is therefore DENIED as moot.[2]

## C. Second Motion to Strike

Defendant challenges Plaintiff's "second supplemental expert disclosures," which added Drs. Christopher Marino and Raymond Harwood to her list of potential expert witnesses alongside Dr. Cherie Bennett, on the grounds that they are untimely and incomplete. *See* Docket No. 57 at ¶¶ 5–6.

Plaintiff's second supplemental disclosures undoubtedly violate the letter of Rule 26. For both Marino and Harwood, Plaintiff simply refers to their depositions without setting forth a

---

[2] In its reply brief, Defendant reserved its right to "object to the admissibility of designated portions of Dr. Bennett's testimony" and to file motions in limine seeking to restrict the scope of Dr. Bennett's deposition testimony as presented at trial. Docket No. 84 at ¶ 5.

summary of either doctor's opinions or giving an indication of the purpose for which she intends to use their testimony. *See* Docket No. 51 at ¶¶ 2–3. We nonetheless conclude that, under the circumstances, the procedural shortfall is harmless.

As Plaintiff points out in her response to this motion, it was Defendant that subpoenaed Marino and Harwood, and not until late February 2014—well after Plaintiff's expert disclosure deadline had passed and Plaintiff had submitted her initial and first supplemental disclosures. Docket No. 86 at 2. As she stated in her disclosures, Plaintiff plans to rely solely on the resulting depositions, without calling either physician to testify at trial. Docket No. 51 at ¶¶ 2–3. Since Defendant elicited the testimony in question and has had full knowledge of its contents for as long as Plaintiff has, Defendant can hardly claim to have suffered unfair "surprise" as a result of this disclosure. *Cf. Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (determining that a faulty disclosure unfairly prejudiced a party by depriving it of its "right to know the conclusions" reached by the designated experts).

Neither can Defendant plausibly accuse Plaintiff of "bad faith" in this respect; Plaintiff made the second supplemental disclosure less than a week after the depositions of Marino and Harwood were taken, and there is no evidence that she knew in advance that Defendant's fact witnesses would furnish what she viewed as favorable expert opinions.[3] *Cf. Tribble*, 670 F.3d at 760 (noting that "willful" delay, even in the absence of clear bad faith, is relevant to whether a rules violation is harmless); *Bellinger v. Deere & Co.,* 881 F. Supp. 813, 817 (N.D.N.Y. 1995) (finding no evidence of bad faith where a party's expert disclosure, though tardy with respect to the case management deadline, followed shortly after its interview with the witness).

---

[3] As we discuss further below, Plaintiff stretches and misconstrues the testimony of the physicians in an effort to build a proximate causation bridge between Mr. Lane's overdose and his subsequent death. In dealing with the motion to strike, however, we are not concerned with the ultimate persuasiveness of the testimony.

The Court recently granted a motion to continue the trial in this case, which is now scheduled to begin on November 25, 2014. *See* Docket No. 107. And as we shall discuss below, the deposition testimony designated in the second supplemental disclosures is insufficient to avoid summary judgment on Plaintiff's wrongful death claim. We thus conclude that it is possible, with the considerable time remaining before trial, to cure any prejudice to Defendant that might result from these incomplete disclosures. *Cf. Sherrod v. Lingle,* 223 F.3d 605, 613 (7th Cir. 2000) (noting that opponent is less likely to be prejudiced by a disclosure if the trial is still "a long way off"). If Plaintiff seeks to use the testimony of Harwood or Marino for the remaining survival action claim at trial, we direct Plaintiff to submit a further disclosure <u>within 14 days of the issuance of this order</u> discussing with specificity the portions of the deposition testimony upon which she seeks to rely—and for what purpose. Under the supervision and timeline to be provided by the Magistrate Judge, Defendant will then have a limited opportunity to take new depositions from the two physicians or obtain alternative expert testimony to rebut issues raised by Plaintiff's disclosure.

In resolving Defendant's motion to strike in this manner, we are mindful of the case law's strong presumption in favor of resolving disputes on their merits rather than through strict application of procedural rules. "In the normal course of events, justice is dispensed by the hearing of cases on their merits; only when the interests of justice are best served by dismissal can this harsh sanction be consonant with the role of courts." *Schilling v. Walworth Cnty. Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986). Here, a circumspect approach is especially warranted by the pivotal role that the designated testimony plays in Plaintiff's attempt to set forth a *prima facie* case for her wrongful death claim. "[W]e recognize that in a case such as this where exclusion necessarily entails dismissal of the case, the sanction 'must be one that a

reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.'" *Sherrod,* 223 F.3d at 612 (quoting *Salgado*, 150 F.3d at 739). As Plaintiff herself has conceded, she relies exclusively on the testimony of Dr. Harwood to establish proximate causation. *See* Docket No. 67 at 8 ("Plaintiff agrees that Dr. Harwood's testimony is necessary to causally link Mr. Lane's early demise with Walgreen's overdose."). She is ultimately unsuccessful in doing so, but dismissing a claim on account of its legal insufficiency is preferable to doing so solely because of the plaintiff's procedural tardiness.

Defendant's second motion to strike is accordingly DENIED, with Plaintiff directed to take the steps described above to enable Defendant to cure any prejudice resulting from the late disclosure with respect to Plaintiff's remaining claim.

## II.     Motion for Partial Summary Judgment on Count II

### A. Standard of review for summary judgment

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the

existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## B. Elements of a wrongful death claim

The Indiana wrongful death statute states that "[w]hen the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action" against those responsible. Ind. Code § 34-23-1-1. The statute provides a vehicle for recovery, but it incorporates the definitions of a "wrongful act or omission" provided by common law. *See Hays v. Bardasian,* 615 F. Supp. 2d 796, 800 (N.D. Ind. 2009). Here, Plaintiff alleges that Defendant's pharmacy outlet in Logansport, Indiana negligently and incorrectly filled Mr. Lane's oxycodone prescription—and in doing so caused his death. Compl. ¶¶ 7–12.

In order to prevail on a wrongful death claim sounding in negligence, a plaintiff must establish the existence of the following three elements: "(1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a

failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach." *Hays,* 615 F. Supp. 2d at 800 (citing *Holt v. Quality Motor Sales, Inc.*, 776 N.E.2d 361, 365 (Ind. Ct. App. 2002)) (further citations omitted). Indiana law recognizes that pharmacists owe a duty of care to their customers—one that can be violated by the errant filling of prescriptions. *See Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 517–520 (Ind. 1994) ("That the law recognizes a relationship between pharmacist and customer as one that gives rise to a duty . . . is well-established."); *Forbes v. Walgreen Co.*, 566 N.E.2d 90, 91 (Ind. Ct. App. 1991) (noting that providing the wrong medication is a breach of the pharmacist's duty of care).

## C. Proximate causation

The only issue disputed by the parties on this motion for summary judgment is that of proximate causation. Pl.'s Resp. 7; Def.'s Br. 4–5. A party claiming injury from negligence bears the burden of proving an injury proximately resulting from the defendant's negligent acts. *Cowe by Cowe v. Forum Grp., Inc.*, 575 N.E.2d 630, 636 (Ind. 1991). A plaintiff must demonstrate that the negligent act of which she complains was "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of"—Mr. Lane's death—"and without which the result would not have occurred." *Porter v. Whitehall Labs., Inc*., 791 F. Supp. 1335, 1341 (S.D. Ind. 1992) (quoting *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 545 (Ind. Ct. App. 1979)).

Expert testimony is generally required to create a material issue of fact where a plaintiff's claims raise questions of medical causation beyond the understanding of lay jurors and "necessarily dependent on the testimony of physicians and surgeons learned in such

matters." *Brown v. Terre Haute Regional Hosp.,* 537 N.E.2d 54, 61 (Ind. Ct. App. 1989). Although Indiana law does not require experts to state their opinions to a particular degree of certainty, *Noblesville Casting Div. of TRW v. Prince,* 438 N.E.2d 722, 731 (Ind. 1982), "testimony as to mere possibilities will not alone suffice to place a fact in issue." *Id.; Watson v. Med. Emergency Serv. Corp.,* 532 N.E.2d 1191, 1195 (Ind. Ct. App. 1989). In other words, an expert's speculation as to proximate causation—standing on its own—is insufficient to avoid summary judgment on the issue. *Noblesville Casting,* 438 N.E.2d at 731.

Here, Plaintiff alleges that Mr. Lane's Oxycodone overdose in October 2010 proximately caused his death in April 2011. Conceding that expert testimony is necessary to "causally link Mr. Lane's early demise with Walgreen's overdose," Plaintiff contends that the designated deposition testimony of Dr. Harwood is sufficient to meet this burden. Pl.'s Resp. 8. As she summarizes: "Dr. Harwood testified that Mr. Lane's success rate, response rate, and life expectancy were reduced by the overdose created by Walgreens. A genuine issue of material fact exists as to whether Defendant's mis-fill of the prescription [led] to Plaintiff's early demise by more than eighteen months." *Id.* at 9. We conclude that Dr. Harwood's testimony—whether by itself or in conjunction with the other evidence in the record—is insufficient to make Plaintiff's *prima facie* case.

Our evaluation of Dr. Harwood's opinions is complicated by the need to excavate Plaintiff's real testimony from Plaintiff's embellished and misleading characterization of it. In her opposition to summary judgment, Plaintiff frames excerpts from Dr. Harwood's deposition in a manner that seriously exaggerates the strength of his opinions, elevating speculation into certainty. As a foundational point, Plaintiff correctly quotes Dr. Harwood's factual testimony regarding the deterioration of Mr. Lane's condition between September 2010 and his next

oncologist appointment in November 2010—the period in which the oxycodone overdose occurred. Pl.'s Resp. 5 (citing Harwood Dep. 89–90). Building on that observation, Plaintiff insists that "[n]o other explanation for Mr. Lane's change in condition from September 28, 2010 to November 23, 2010 could be attributed to anything other than the overdose." Pl.'s Resp. 6, ¶ 3 (quoting Harwood Dep. 97–98). In reality, however, Dr. Harwood declined to give a firm opinion as to the cause of Mr. Lane's worsened condition, repeatedly noting that he lacked the knowledge necessary to offer anything but speculation. Upon questioning from Plaintiff's counsel at his deposition, Dr. Harwood stated that, "based on information provided," he would agree with the notion that a "traumatic event" occurred to Mr. Lane between September and November 2010. Harwood Dep. 96. Plaintiff's counsel then pressed further, leading to the following exchange:

> Question: Okay. So as you sit here, to the best of your knowledge, in ruling out anything else as you sit here, there's no other explanation for the change in condition from September 28, 2010, to November 23, 2010, as you sit here today?
>
> Answer: Not being in primary care of his other medical issues, you know, I don't have knowledge of that.

*Id*. Harwood further acknowledged that the October 15 hospital admission after the Oxycodone overdose was the only medical event in the two-month period of which he had knowledge, but he stopped short of giving a clear answer with respect to causation. *Id.* at 97.[4]

---

[4] His exchange with Plaintiff's counsel continued:
"Q: So you don't have any knowledge of anything else other than – the only thing you have today, though, is the OxyContin overdose; true?
A: Maybe rephrase that for me, if you would.
Q: Sure. From what you have in front of you, based upon your record, based upon everything that you have, the best of your knowledge as you sit here today, you have no other explanation for the change in condition from your September visit to your November visit other than the overdose of OxyContin IR; correct?
A: Just knowledge of the admission for the overdose and then the multiple subsequent admissions.
Q: So that's correct?
A: That's correct."
Harwood Dep. 96–97.

If Harwood gave only equivocal backing to Plaintiff's theory that an oxycodone overdose caused the weakness and poor health that he observed in Mr. Lane as of November 2010, he gave hardly any support at all for any causal link between the mis-filled prescription and his death in April 2011. In her brief, Plaintiff states: "As his treating oncologist for more than twenty (20) years, Dr. Harwood testified that the Oxycodone played a major role in his early death." Pl.'s Resp. 6 at ¶ 6 (citing Harwood Dep. 117–119). This is an outright mischaracterization, wholly unsupported by the evidence. In the portion of his deposition cited by Plaintiff, Dr. Harwood fielded further questions about the likely cause of Mr. Lane's poor condition in November 2010:

> Q: If you assume that the testimony in this case will be that his condition did not change as of October 14, 2010, when Dr. Bennett saw him. He could feed himself; he could take care of his colostomy bag; he could garden a little; he could walk; he could feed himself. And the next thing that happened is the overdose of OxyContin and subsequent treatment at the hospital, at Merry Manor, and Arbor up until the moment you see him in November 2010. Let me ask you this then:

> To the best of your knowledge based upon those facts, there's no other explanation for the change in his condition from September 28, 2010, to November 23, 2010, other than the overdose on October 14, 2010; is that true?

> [Defense counsel objects]

> Q: Go ahead. You may answer.

> A: It's a reasonable assumption. But not seeing him in that six-week time frame, you know, it's – I can't – give a definitive as an only reason.

> Q: It does not have to be the sole cause but more likely than not that is the standard?

> . . .

> A: You can assume it had a major role.

> Q: Okay. That the OxyContin overdose had a major role?

> A: Correct.

Harwood Dep. 117–119. Nowhere in the designated testimony does Dr. Harwood draw a causal link between the overdose and Mr. Lane's death—indeed, the "assumption" he offers relates only to the change in Mr. Lane's condition during a two month period that ended several months before he died in April 2011. When asked more directly by defense counsel whether he had an opinion on a link between the incorrectly filled prescription and Mr. Lane's eventual death, Dr. Harwood replied that he had "no way to determine that" and "no opinion." Harwood Dep. 70–71.[5]

Plaintiff also cites Dr. Harwood's testimony for the proposition that, as of September 2010, Mr. Lane's prognosis was good enough that "he should have lived for two more years." Pl.'s Resp. 6 at ¶ 4 (citing Harwood Dep. 100, 102). In the absence of any direct testimony that the oxycodone overdose caused or hastened Mr. Lane's death, Plaintiff apparently seeks to use this testimony to buttress an inference that the overdose definitively reduced his life expectancy—hence her argument, given Mr. Lane's death six months after receiving this positive prognosis, that "Defendant's mis-fill of the prescription [led] to Plaintiff's early demise by more than eighteen (18) months." Id. at 9. The problem for Plaintiff, however, is that Dr. Harwood neither gave a firm opinion as to Mr. Lane's life expectancy before the overdose nor opined that the overdose reduced it. His actual testimony on the issue was as follows:

> Q: Doctor, based on his condition as of September 28, 2010 . . . what was your conservative opinion as to how long Mr. Lane would live?
>
> [Defense counsel objects]
>
> Q: Go ahead.
>
> A: I mean, I had every evidence that his myeloma was still controlled, quiet, so he could put – potentially have lived several more years.

---

[5] Perhaps unsurprisingly, Plaintiff did not designate this portion of Dr. Harwood's deposition testimony.

Q: Doctor, your opinion based upon your education, training, experience, is more likely than not Mr. Lane would have lived, conservatively, approximately two more years from September 28, 2010; is that true?

[Defense counsel objects]

A: At that far out, I tend to take a shorter view and then six months ahead of time and not, you know, a – so I have no evidence of any impending issues with his myeloma.

Q: So approximately two years would have been your opinion, more likely than not, he would have lived, approximately?

A: I would hope . . . .

Harwood Dep. 100–101. As with other portions of the deposition, Plaintiff seeks to quote Dr. Harwood for the statements counsel tried—and largely failed—to put in his mouth. Dr. Harwood first resisted pronouncing on any concrete longer-term life expectancy with a myeloma patient; when prodded further, he expressed his *hope* that the patient would have lived two more years as of September 2010. *Id.* Nowhere in his testimony does Dr. Harwood state that an Oxycodone overdose, or any other incident, intervened to reduce Mr. Lane's life expectancy.

Dr. Harwood did not provide expert testimony on the cause of Mr. Lane's death. His willingness to speculate that an Oxycodone overdose could have been the cause of Mr. Lane's poor condition in November 2010 is only one link in a possible causal chain between the overdose and the death some six months later—and a tentatively forged one at that. Standing alone, the opinions offered by Dr. Harwood are thus insufficient to avoid summary judgment on the issue of proximate causation. *See Noblesville Casting*, 438 N.E.2d at 731 ("[A]n opinion which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict."). None of the other designated evidence is sufficient to fill the rather large chasm separating Dr. Harwood's opinions from a viable *prima facie* case on the issue. Dr. Cherie Bennett, Mr. Lane's primary care provider, testified in general terms that "an overdose of a

narcotic pain medication . . . can kill you."[6] Bennett Dep. 31.[7] Based on a review of the records of his hospitalization on October 18, 2010, she noted that Mr. Lane had "some confusion" and had lost continence. However, she never opined that this—or any other of his many health problems—was related to a possible Oxycodone overdose; in fact, she specifically noted the heavy dosages of other painkillers he was taking at the time as possible sources of his difficulties with motor control in October 2010.[8]

The testimony of Dr. Christopher Marino is similarly unhelpful to Plaintiff's cause. Dr. Marino did note that a drug like oxycodone may metabolize more slowly in the body of an elderly patient than a younger one, Marino Dep. 106, 109; he also confirmed that Mr. Lane was less than fully alert when he left the hospital on October 16, 2010. *Id.* at 126. Dr. Marino was in a position to offer factual testimony only with respect to the brief period in October 2010 when he came into contact with Mr. Lane; apart from his general statement about the body's metabolism of Oxycodone, he offered no expert opinions about any possible long-term consequences of an overdose—let alone the causes of a patient's death several months later.

---

[6] The context of this statement makes clear that death caused by an overdose would be concurrent with, or follow shortly after, the period when the medication was actually in the patient's system.

[7] In her sur-reply to this motion, Plaintiff also discussed elements of the testimony of Defendants' experts, toxicologist Michael Evans, Ph.D., and oncologist Rafat Abonour, M.D. Plaintiff points to the testimony of both doctors in support of the proposition that an elderly person with chronic issues like Mr. Lane may be "more susceptible to injuries from an Oxycodone overdose," and that an "Oxycodone overdose may stay in the body longer in an elderly ill person than it would stay in a healthy adult." *See* Pl.'s Sur-Reply 2 (citing Abonour Dep. 26, 35). As Plaintiff herself obliquely concedes, these opinions cover no new ground. *Id.* at 3 ("Dr. Abonour provides a further factual foundation for Dr. Harwood's opinion"). The *general* danger of a drug overdose to an elderly patient is not in dispute, and Drs. Bennett and Marino had already acknowledged as much. Bennett Dep. 31; Marino Dep. 106, 109. This additional testimony may support an inference that Mr. Lane's symptoms when he reported to the hospital on October 15, 2010 were related to the oxycodone overdose, but it does nothing to address the yawning hole in Plaintiff's *prima facie* case—the lack of any demonstrated connection between that incident and the multiple factors that directly caused Mr. Lane's death in April 2011.

[8] In her words, basing her recollection on Mr. Lane's treatment notes from October 18, 2010: "He is alternating between severe pain and excess sedation when he is on the pain medicine. The patient was seen in the emergency room and given Dilaudid 2 milligrams and then he slept through much of my interview. And he has had increased constipation since the pain meds were increased and the patient has not eaten anything in the last day. And I observed him having difficulty swallowing when he was sedated." Bennett Dep. 34.

The one piece of evidence in the record that explicitly addresses the causes of Mr. Lane's death—the death certificate authored by Dr. Bennett—is flatly inconsistent with Plaintiff's claim. The certificate recites three primary causes of death and several more secondary ones, but it never mentions a medication overdose. *See* Def.'s Ex. 4. Neither Dr. Bennett herself nor any other witness provided testimony suggesting that the numerous pre-existing, chronic maladies suffered by Mr. Lane and officially listed as his causes of death were exacerbated or even affected by the negligent act at issue in this case.

Even if Dr. Harwood, upon whom Plaintiff relies exclusively to meet her burden, had offered his opinions with "reasonable scientific or medical certainty"—which he did not—his speculations drew a connection only from the overdose to November 2010. *Cf. Noblesville Casting,* 438 N.E.2d at 731. Further expert testimony connecting Mr. Lane's condition in November to his death in April would be needed to carry Plaintiff's theory over the threshold; she has provided us with none.

## III.    Conclusion

In considering Defendant's motion to strike the testimony of Drs. Marino and Harwood, we have concluded that the Court's interest in upholding the procedural guidelines that promote the orderly and expeditious resolution of disputes, though a substantial one, gives way in this instance to our strong presumption in favor of deciding cases based on matters of substance rather than technicality. Ultimately, Plaintiff's attempt to stave off summary judgment by designating the depositions of Defendant's fact witnesses as expert opinions was an exercise in wishful thinking—and dubious mischaracterization. Read fairly, the record in this case paints a picture of an elderly man who suffered from a constellation of serious health problems that both

pre-dated and post-dated Walgreens' incorrectly filled prescription, and who eventually succumbed to some combination of those ailments. None of the designated evidence, timely or untimely, allows Plaintiff to carry her burden with respect to proximate causation; Plaintiff's wrongful death claim therefore fails.

Defendant's motions to strike are DENIED, with the additional instructions to the parties regarding the possibility of additional discovery to remedy any prejudice to Defendant as discussed in Part I of this opinion. Defendant's motion for partial summary judgment on Count II of the complaint is GRANTED.

IT IS SO ORDERED.

Date: _06/24/2014_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew M. Golitko
GOLITKO & DALY, P.C.
matt@golitkodaly.com

Robert Thomas Dassow
HOVDE DASSOW & DEETS LLC
rdassow@hovdelaw.com

Edward J. Fujawa
LEWIS WAGNER LLP
efujawa@lewiswagner.com

Susan E. Cline
LEWIS WAGNER LLP
scline@lewiswagner.com